Submitted cases. The submitted cases are Davis v. Merit System Protection Board and Wilder v. United States. We'll hear argument first in Homedica Osteonic, if I'm pronouncing that correctly, v. Wright Medical. Mr. Mintlick. Good morning. This Court has repeatedly held that absent a clearly expressed intention to do so, patent claims are not to be restricted or limited to the preferred embodiment or even the only embodiment that's disclosed in the specification. The District Court should be reversed here because it violated that principle when indeed it restricted the claims to the preferred embodiment only in the context of a bicondylar knee implant without ever identifying, or Wright Medical for that matter, ever identifying any such clear expression of limitation. But what about Phillips and the fact that you agree that you read the language of the claim in the context of the specification? Undoubtedly we do, Your Honor. And so beyond just the preferred embodiment, we're looking in the entire specification, and the ambiguity, the lack of clarity I have is where is anything in the specification that coincides, justifies, or says what your broad construction is of the claim language? Your Honor, there are actually several places. First and foremost, the claims themselves. The language of the claims, the use of the word the in the body of the claim to describe in the singular the conjular element referring back to at least one. Right there we have an absolute indication and an admission by Wright Medical that the patent claims are broad enough to cover more than what's disclosed. We all agree. But looking then at the claim language, although I do want you to get to the spec, where it says that more than one or more, the at least conjular element for blah, blah, blah to accomplish articulation. Do you agree that in a bicondylar prosthetic both, what are they called? Condyles. Condyles must be involved for the knee to articulate? Absolutely, Your Honor. But what that doesn't tell you is what the geometry of those condyles must be. In fact, the claim is in Jetson form, so the preamble to the claim sets forth the prior art, and it talks about a bicondylar knee implant having two condyles that accomplish the articulation. But in the prior art, neither condyle had this particular geometry, or possibly one did, but certainly not both. So the fact that you need two condyles having a particular surface geometry to articulate doesn't tell you at all what the geometry must be. The prior art articulated, the accused device articulates. What happens with a natural knee in a unicondylar device? Does the natural knee's other condyle articulate with the same geometry? Well, the geometry of a natural knee, Your Honor, is not going to be perfect. It's not going to have a constant radius necessarily. It may have an irregular surface. But yes, when you have a unicondylar knee, one condyle has been diseased. You cut bone, put the implant in, and then that condyle together with the remaining condyle, which is still natural bone, together will accomplish the articulation. In fact, Your Honor, what establishes that here, the language of the claim, should not be limited to the perpetual embodiment is, let's take a unicondylar knee, which everyone acknowledges could be within the scope of this claim by virtue of the language at least one. We have an infringing device. We send it back to the machine shop, and somehow, and I'm not saying this actually happens in practice, but theoretically, you could solder onto it, weld onto it somehow, add a second condylar element that has a different geometry that will articulate. How would that convert what was demonstrably an infringing device into a non-infringing device? So in terms of the specification, Your Honor, in terms of the claims, what's important is what is not there. What's the problem here with the other condylar element in the accused device? It's that it doesn't have a constant radius in that minus 15 area of hyperextension? That's correct, Your Honor. That's correct. Our contention was, and we conceded, that only one of the two condyles met the limitation. Now, there's some question that Wright Medical has raised as to whether the other one does as well, but that's not for this appeal. Our position that one does have it and one does not is predicated on their only expert report asserted non-infringement on the basis that one didn't. They never said anything about the other in our view of these cases, which has been ready for trial and pretrial. That's a concession that the other one does, and we have that proof, but that's not for this appeal. If it goes up remand, of course, we'll deal with that issue. Now, you didn't put in any evidence from experts as to whether the purposes of the invention would be served if you had just one condyle with the specified geometry, right? I don't specifically recall everything that our experts said, Your Honor, but I can assure you that we know from the record by Wright's own admissions, and there are documents we cite to in the appendix that Wright's accused device in almost identical language to the objects and advantages set forth in our patent. This is the advertising? Yes, and some internal marketing documents tout their devices working, but again, that's not so important. Well, tout it as working, but do those advertisements address the constant radius issue? Some of them do, Your Honor, yes, and again, as far as the objects and advantages go, we cite a number of cases, including the Kim case, which basically say that if you don't have the objects and advantages recited as limitations in the claim, they're not limitations. We don't need to achieve all of the objects and advantages to have infringement here. Do you have to achieve some of them? Do you have to achieve some of them? Yeah. Your Honor, not if they're not recited as limitations. You look at the claim. It's covered. It's covered. Inefficient infringement is infringement nonetheless. They have to be set forth as limitations, but here, Your Honor, some of them at least are most definitely achieved, and again, we have that admission in their own papers. Which of those? Which of the… The ones that are achieved. The ones that are achieved, Your Honor, for example, if you look to our gray brief, they are set forth. We quote at some length on page 6 of the gray brief where it talks about the advanced medial knee system, restoring the natural axis of rotation, providing greater tibiofemoral conformity. They go on and on, and actually we draw a comparison down at the bottom of page 6, Your Honor, where we compare a statement in the 100 patent, enables a higher degree of conformity between the conjular elements and the bearing member for reduced bearing stresses during normal activity. Where does it say that in the end? I'm sorry? That's in our patent, and then it's followed by Reich's literature, which appears from appendix page 2437, provide greater tibiofemoral conformity with maximum contact area. So there's at least one, Your Honor. Can you address the plural language, which is the language the district court relied on in the patent? It's singular in the claim and plural to a large extent in the specification. What's the reason for the distinction in the language used? In the specification, where Mr. Jacobs, who was the drafting attorney here, was describing the preferred embodiment, there is no dispute. We do not dispute for one moment that the only embodiment described in detail is the bicondylar knee with both condyles having the same radius of curvature. And do you agree that there's nothing in the specification that describes, suggests, or even mentions a bicondylar prosthesis where only one conjular element satisfies the geometric requirements in the claim? Yes, Your Honor, we do. You agree? We do agree with that. That there's nothing in the spec that suggests that. We do agree with that. There is a portion of the prosecution history, however, that I'd like to respectfully refer Your Honors to, in which Mr. Jacobs, and this appears at page 1855, this is the amendment after the interview, in which Mr. Jacobs says the following. All the claims have been amended in accordance with the discussion of the aforesaid interview, and here's the important part, in order to point out more clearly that the subject matter of the claims includes a conjular element, not two, not both, not even each, a conjular element, demonstrably singular, in which the anterior-posterior surface contour, and I won't go into all the geometric details, but it describes the specifics. So in the intrinsic evidence, we have Mr. Jacobs discussing a condyle. What we believe is required here, plain and simple, is for right medical to prevail. They have to prove that when the patent claim says the, it means each. Well, let me ask you, hypothetically, if you've got claim language, a claim recites a jacket comprising one or more buttons used to close the jacket. One or more buttons. The button closing the jacket being made of bronze. If I have two buttons closing my jacket, don't we construe that as being that they're both bronze? I'm sorry, Your Honor, I missed the second part. We have one or two buttons. One or two, comprising one or more buttons used to close the jacket. One or more. Yes. The button closing the jacket being made of bronze. If you have two buttons on that jacket, aren't they both bronze? Two buttons on the jacket that are used to close the jacket, don't you construe that as they're both being bronze? I do not agree with that, Your Honor, because you may have inefficient infringement, but one is going to be sufficient to close the jacket, unless it's demonstrated that one won't close it all by itself. I think, again, the reference to the. Okay, so one won't close it by itself. So you're saying in this claim language, you have to demonstrate in order to be covered with the bicondylar elements that one wouldn't be enough to do it? Or that there was an intention on the part of the applicants to limit their claims. It doesn't have to do it well. We're not talking about whether this invention is indeed better than the prior art. So what is the meaning of Phillips about reading this in the context of the specification? Oh, you do. What are we using in the specification to justify your reading? Everything you've pointed, you've already acknowledged that nothing in the specification mentions, refers to, or suggests the reading you ask not to apply. But Phillips already also tells us, Your Honor, that you don't restrict the claims absent language of exclusion. The claims and the patent itself, we point this out, say we've described the preferred embodiment. We don't intend to be limited to it. So you don't need something to say we intend to cover this. What you look for is there's something that says we don't intend to cover this. Are there manifest words of exclusion? That was the words of the libel floor sham case on which Phillips relies. Well, aren't you going to have a written description or enablement problem if you've got claims that are being construed to cover things that are not mentioned, referenced, or suggested in the specification? Not at all, Your Honor, because we have an original claim. If we didn't have an original claim and we tried to broaden, if the original claim said each, for example, and then we narrowed, or broadened, I should say, and we changed each to the during prosecution, maybe arguably you would have a written description problem. But because we're construing an original claim, written descriptions are not an issue. Written description is only implicated when you're claiming something where you've amended and now you go back to the original filed patent to see if there was absent any description of that particular device. And what about enablement? I'm sorry, enablement, it certainly teaches you how to do it. Anyone of skill in the art would know how to do this because all they have to do is do one condyle the way we do it, do another condyle like the prior art has it. So there's no enablement issue. It's very easy for one of skill in the art to design this. So I realize we had reserved a lot for our rebuttal, Your Honor. I'm happy to keep going, but the last point I would like to make is simply each, in plain English, does not mean the. And here, unless it is found that each was intended to mean the, I'm sorry, that the was intended to mean each, there is no clear intention to exclude this intermediate position. And that's what this Court of Jurisprudence has said. You don't limit us, even if it's the only thing disclosed, forget the preferred embodiment, if there were only a single embodiment here and it said nothing about anything else. And by the way, we know that's not the case because of the at least one language. Nowhere will you find a description of a unicondylamine in this patent, but we all agree it covers that. So absent that finding, clear intention, not equipoise, not maybe it means that. It has to be a clear intention to exclude the subject matter. Or the claim should be construed irrespective of whether you get efficient infringement, irrespective of whether you get all the objects and advantages. We should prevail on this claim construction issue. I'll save the rest for rebuttal and my co-counsel. We'll give you five minutes for rebuttal. Thank you, Your Honor. Mr. Silverstein, if there's any issues about the release defense, my co-counsel will give me court's indulgence with that. Well, no, I think we'll just hear from one counsel on rebuttal. Thank you, Your Honor. Okay, Mr. Silverstein. May it please the Court. My name is Woody Jamison, and I represent the Appellee Right Medical Technology. The district court was correct in finding that in a bicondylar prosthesis You're relying here, as I understand it, primarily on two things. One is the purposes of the invention, that the purposes of the invention wouldn't be satisfied in a bicondylar situation if only one condyle satisfied the radius limitation, right? And then the second thing is the testimony of the inventor. Your Honor, we are actually relying on the language of the claim itself, Claim 15. We're relying on the fact that every object and advantage of the invention as described in the specification is met by a bicondylar prosthesis. But that's not enough, because Phillips makes clear that the mere fact that the specification describes only one embodiment doesn't mean that you limit the claim language to that. So you have to have something more. That's correct, Your Honor. And what we have in this case, consistent with the Phillips decision, is we have the entirety of the intrinsic record, which is the claim language itself and the context of the language used in the claims. It is fully supported by the written specification. With respect to their position, there's no support in the written specification for their position. We have inventor testimony that we believe would constitute admissions against interest as to what he was driving at through his use of at least one in the claims, as well as what his invention covered. We have prosecution history that while it does not compel the outcome of this case, it is certainly consistent with the court's ultimate construction in this case. And then we have testimony from one of skill in the art, our expert, Dr. Bradley, who said that when he read Claim 15, that he read it to mean that in a bicondylar prosthesis that both condyles had to meet the geometric limit. I think that overstates what he said. But let me get back to the claim language. How does the word the and the words at least one lead to the conclusion, quote, must have two, which in a graphic way is what you're arguing? Your Honor, it goes directly to Judge Prost's question. When she asked the question, for purposes of accomplishing articulation of the knee prosthesis, don't both condyles have to be involved? Involved is one thing. Of the same type is another. You're saying for balance, I assume you're arguing that balance is necessary and therefore they both have to be the same. Is that your argument? My argument is once you have determined that both have to be involved, and if you look at the language, the femoral component, including at least one condylar element for engaging and confronting. So we know we have two condyles that are engaging and confronting the tibial component in the knee prosthesis. It's those two condyles that accomplish the articulation of the knee prosthesis. And that's what we learn in the preamble. Both condyles, the at least one is both. They may have to accomplish the articulation, but that's not addressing the invention. The invention is the constant radius. But it seems to me I'm having the same difficulty that Judge Hochberg is having with getting out of the language a requirement that both condyles in this situation have to have the same radial characteristics. They have acknowledged that the subsequent reference to the condylar element later in the claim, it refers back to the at least one. Well, let me ask you this. In a unicondylar knee, if the person's natural condyle, the second condyle, doesn't have the same perfect radius that the invention claims to have, it's infringing anyway, correct? If one did a single unicondylar knee with the patented condyle, condylar element. The claim as drafted, because it does use at least one in the context of a unicondylar knee. It just uses at least one. It doesn't say what the context is in the claim. It says at least one, and it talks about the. Right. And so in that context, because we're talking about a knee prosthesis, we're talking about a unicondylar prosthesis by definition, and to your question, the claim requires is not articulation of the natural knee. It's articulation of the knee prosthesis. Well, put it differently. Let's suppose that the natural condyle, in a situation where you only have one condyle replaced, the natural condyle doesn't satisfy the radius requirement, and that's possible, right? Yes. Okay. So if that's true, how can the purposes of the invention be satisfied under those circumstances but not satisfied if you have two artificial condyles? Your Honor, that actually goes to an invalidity issue, in my opinion, which is the claim language is broad enough to cover a unicondylar prosthesis. There is no discussion whatsoever of a unicondylar prosthesis anywhere in this patent, but the Federal Circuit has told us in no uncertain terms that at least one, it could mean one, it could mean more than one. I don't think you're answering the question. I'm sorry. The question is, let's take Wright's artificial knee, Wright's prosthesis. You've got two condyles in your prosthesis, correct? Correct. One is the same as the patented condyle, correct? At least that's stipulated for purposes of this appeal. Well, it complies with the constant radius within a certain portion of flexion. So it corresponds to the patented condyle. And then one, does the other one that does not, does that have the same constant radius? It does not have the same constant radius as the other condyle. Then how are there any benefits and advantages of the Wright prosthetic knee? With respect to the 100 patent? No, with respect to the fact that you've been claiming that in order to get the benefits and advantages of this prosthetic knee, both condyles have to meet the same radius. Wright has now produced one which has only one condyle that meets the constant radius, and the other one does not. How does that prosthetic knee have its benefits and advantages? Well, Your Honor, I think that really goes to the technology that we're talking about, the number of patents that are involved in this area. Does it have benefits and advantages? Absolutely. And what are its benefits and advantages? They talk about... No, I'm talking about Wright's dual, bicondylar knee, which has two different radii on its condylar elements. What are the benefits and advantages of that?  Does it have the benefits and advantages described in the patent? It absolutely achieves some of the same benefits and advantages achieved in the patent. But, and that's the point that I was driving at, the fact that Wright Medical has come up with a different way of achieving objects and advantages that are set forth in the patent, Wright Medical may very well have its own patented technology, and that's what this industry is all about. But if you can see that it achieves the benefits and advantages described in the patent, how is it, then, that we should construe the claims to require that both condyles have the same geometry? Because you're telling us that even if only one of them has the required geometry, that some of the advantages of the patent are secured. Your Honor, it goes back to what's being required by this claim. And we're told that whatever the condylar element is in the claim, it has to have a constant radius. Yeah, but I don't think you're addressing the point. The point that Judge Hochberg and I are both asking you about is that one of your arguments is that where you have two artificial condyles, that you're saying that they both have to satisfy the geometry in order to secure the advantages of the patent. And yet you're admitting that where you have a single artificial condyle and a natural condyle, that the advantages of the patent will be secured, even though the natural condyle doesn't satisfy the geometry requirements, correct? Right. That doesn't seem to be consistent. Well, Your Honor, the fact that we have come up with a different way to achieve certain objects and advantages that are described in their patent, with all due respect, I would think that would be irrelevant. I mean, that's why people come up with patented technology. Everybody in this industry is trying to achieve the same objects and advantages. Well, that's all well and good, but it seems to me that this destroys your argument based on the purposes of the patent. And your argument is that the purposes of the patent require that both artificial condyles have the required geometry. Your Honor, I think that may, and maybe it's an overstatement in our brief, but... What's an overstatement? I said that what we said in our brief is that the objects and advantages are achieved through a bicondylar prosthesis that meets the geometric limitations of the claim. It's consistent with everything that is in the specification. I think you're saying that it compels the outcome of this case. Let me ask you, at the district court level you put on an expert that says it's necessary for both condyles to have the same radius in order to achieve balance during articulation. Would two different condyle radii still achieve balance then, if Wright's own prosthetic knee has two different radii in its condyles? It can, Your Honor, yes. So balance can be achieved both ways then? Balance can be achieved both ways. Did your expert say that at the district court level? I don't believe that we got into that at the district court level. Well, the judge relied on it. Well, the judge relied on his testimony that it supports his claim construction. And I think, and maybe I'm mincing words here, splitting the line a little too thin, but there's a difference in saying it compels the outcome of the case and it simply supports the case. And our position is simply that the objects and the advantages that are set forth in the specification, they absolutely are achieved through a bicondylar prosthesis. There's nothing in this specification. The question is, are they achieved in a, the question that both Judge Dyke and I are asking you is, and it seems you've already answered yes is, some of those advantages are achieved in a bicondylar device where both condyles do not have the precisely same radius. That is right. They will have a constant radius, but they're not going to be the same radius. So whatever the radius is in one condyle, it's going to be X length. The other condyle is not going to be the same length. So they achieve the advantages, or at least some of the advantages of the invention, even though only one condyle satisfies the claim limitation radius and the other one doesn't. I'm sorry, Your Honor. With two artificial condyles, if one of them satisfies the radius requirement of the patent claim and one does not, that the prosthesis will still achieve at least some of the objectives of the invention. There is no disclosure of that anywhere. That's the question being put to you. Will it? Will it in the real world? Yes. There are products out there that will achieve certain of the objects of the invention where you do not have radius that are of the same length. That don't have radiuses where one of the radiuses doesn't comply with the claim limitation. Right. Right. Okay. Are there other questions? No. I wanted to ask you one or two questions about the release issue. Yes, Your Honor. Do you agree that on the release issue that the question of reformation is properly in this case? No, Your Honor. Why not? My understanding of New Jersey law is that reformation only takes place where you are literally rewriting part of a contract because there's either been a mutual mistake of fact or there has been a mistake of fact coupled by fraud. Okay, but it sounds very much as though there's an allegation here that there was a mutual mistake. Your Honor, in the gray brief, at the very end of the gray brief, they make some passing reference to that, but that issue has never been teed up through evidence showing that there was a true mutual mistake. Well, I've read the evidence that it possibly could be read as suggesting that there was a mutual mistake. My question is, is that theory part of this case? I don't think it is, Your Honor. Why not? Well, that wasn't the argument that they made at the district court level, and I don't think that's the argument that they have made in front of you. I think the argument— Well, no, it's not the argument they made in front of us. The question is, if we were to say that the district courts should have interpreted this release according to its literal terms, is the argument of reformation still open? In other words, if we reject the interpretation adopted by the district court, is the reformation issue still here? I don't think it is, Your Honor, because it hasn't been raised on appeal. Why do they have to raise it on appeal? Well, they didn't raise it at the lower court level, and they haven't argued it on appeal, and so there's no argument or evidence to support that there's been this mutual mistake that would be required for reformation, and there's certainly been no proof of fraud. And so what we're left with is we're left with an unambiguous agreement, an unambiguous provision. They have never offered what is the alternative reasonable interpretation of paragraph 27 that is required under New Jersey law, and I believe that this case really is on all fours with the Federal Circuit's decision in the Augustine case. Granted, that was Minnesota law, but when you look at the facts of Augustine, it couldn't be more closer to this case. What is the evidence with respect to the intent of the parties in this release form? The evidence would be that there's competing evidence, and that's why if you were to find an ambiguity somewhere in this agreement, we believe at a minimum that there would be a fact issue, that this would have to go back to the district court. What is the – putting aside the actual agreement terms, what other evidence is there of any intent by Helmetica to release their claims against Wright? Outside the four corners of the document. Correct. The intent of the parties. Helmetica has – well, I would tell you the intent would be evidence in the four corners of the document because they were – That's not what I asked you. But what did they say? What did Wright put in? Helmetica is relying on, would say that they did not intend for this – And does Wright – did Wright put on evidence showing the intent? Yes. And where is that in the appendix? Your Honor, the Hood Declaration at A253 at 1254 stated that they never would have signed this agreement if they felt that it did not release claims consistent with paragraph 27. Well, what does that mean? I mean, I've read some of the record here and the testimony that was given. It strikes me that your witness' testimony can be read as suggesting that they didn't understand that this would be a general release either. That's what I read as well. That's why I asked you the question. And I think on that point, Your Honor, we have to remember these are cross motions for summary judgment. So, you know, the question is posed. It can be read as suggesting that they didn't understand it. If we're going to get into the evidence that's outside the contract, then all inferences with respect to Helmetica's motion against us should be construed against them. But maybe what we have here is a fact issue for purposes of reformation, whether both parties, despite the language of the contract, intended something different, that they amended the Massachusetts release to achieve their purposes, but that just through inadvertence the New Jersey release wasn't amended to achieve those purposes. If we get to that issue, Your Honor, I would agree with you that at a minimal we have a fact issue. I'm struggling with how we get to the reformation issue when they basically conceded at the district court level that they were not arguing reformation. There's a in their- But they weren't arguing reformation in the summary judgment motion, or they weren't arguing reformation at all? In our brief at page 55, and it's citing to the record of A2009, there is a quote from Helmetica, that writes, opposition erroneously assumes that Helmetica is seeking summary judgment on grounds of reformation. That's a quote from- But it's not quite the same thing as saying the reformation issue isn't in the case. It may well be that their summary judgment motion didn't seek summary judgment on the grounds of reformation, but that doesn't mean that reformation isn't potentially part of the case, does it? Well, Your Honor, I don't believe that they argued- I'm aware of no argument by them that in response to our motion for summary judgment that they argued reformation. Okay. Anything else? Okay, thank you, Mr. Silverstein. If I may, Your Honor? What about the reformation question? Your Honor, would you indulge Mr. Silverstein? No, I think one reply is enough. Okay, well, I'll do the best I can with that, Your Honor. First of all, Augustine has nothing to do with this case. It is number one, Minnesota law. Number two, there was no evidence in Augustine's- But what about the reformation issue? The reformation issue, Your Honor, I fully- two things. First of all, under New Jersey law, you don't need a formal reformation, as the Krasnowski case tells us, and Judge Linares actually specifically noted, to effectuate the intent of the parties. He can do it, the court can do it, based on what is the clear intention of the parties. Did you raise reformation in opposing their summary judgment motion? In opposing summary judgment, other than to indicate facts that there could have been, and we believe was, mutual mistake here, we didn't make it on summary judgment. Your counsel is nodding. You can consult with him. That's okay. We did not, on summary judgment, raise reformation on summary judgment. But Your Honor is absolutely correct that if summary judgment were not granted to us, it is certainly an issue that we could have raised. As far as the Jason Hood declaration, Your Honor asked whether there's evidence. Jason Hood's declaration was excluded from this record. Jason Hood's declaration was not on personal knowledge. It was excluded by Judge Linares, clear as can be, in his decision. And there's been no effort here to some way resurrect it for purposes of this defense. So all in all, we believe that the uncontroverted facts... So is the Hood... It's not in the... Oh, it's probably in the appendix as part of all the papers that were put before you. But, because... If it was excluded from the record, did it need a motion to... No, no, I'm sorry, not excluded from the record. It was, Judge Linares indicated that he would not consider it. I see. That it was not competent evidence to raise the issue that Wright Medical was trying to raise, namely that it was always their intention to actually cover this particular claim. That was belied, for example, by the fact that where were they for two and a half years? They litigated for two years and then said, oh, by the way, we have a release. There's no question that the parties here, and again, the people who signed the agreement, Mr. Patton, Mr. Lipes, they never noticed the difference between the two releases. And in Augustine, for example, it was clear that general releases were intended. Here, demonstrably, they were not intended, and the mutual intent of these parties was not to have general releases. Well, that may be the testimony, but the language is a problem for you.  Well, how is that language in paragraph 27, which seems to be clear on its face, inconsistent with any other provision in the agreement? First of all, it's irreconcilable with the release provision of the other agreement, and the two agreements must be read as a unitary document. They say so. If we had 20 specific releases and then one general release, that general release would wipe out everything else, and that's a conflict. The only real negotiation over a release here was with respect to the narrow release in which it was clear as a bell in the letter the Council wrote that we're not releasing anything other than the things we're talking about. Yes, the other agreement was not so conformed, but read together, you have an irreconcilable conflict, and the narrow should conform. But it's not a conflict, is it? Well, it's a conflict insofar as if you look even at the rest of the provisions of the two agreements. In the two agreements, there are the recitals, there are the releases, there are the cross licenses. Everything unitarily is directed to just the matters at issue between the parties. There is no indication the general releases were intended. Everything is to expressly the contrary, that they were just looking to deal with the things that they dealt with. Mr. Patton unquivocally testified that he never believed. In fact, he begged Mr. Lipes, I want to include this other claim, and he acknowledges that Mr. Lipes continued to say, no, not included, it's off the table. So under those circumstances, Judge Lanieris was absolutely, in our view, correct in concluding that the manifest intent of the parties here was how it ought to be. Now, we cite in our briefs the Van Slyke case. It's a 1910 decision by the New Jersey Supreme Court in which despite language of a release, releases are to be construed very, very narrowly. You're giving up claims. The Van Slyke court held that despite the fact that the release on its face would have presumably excluded a claim, nonetheless a determination of the intention of the parties. New Jersey is very liberal in that regard, Your Honor, in going to the extreme steps. Is it so liberal that there's no reformation doctrine necessary anymore? Well, that, Your Honor, I can't really address, but I do know from Krasnowski that Krasnowski certainly, as cited by Judge Lanieris, suggests that you don't need formal reformation if the court can effectuate what is the manifest intent of the parties. Any other questions? Thank you. I think that's enough. Thank you.